IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

**STATE OF TENNESSEE v. DEANGELO LOVE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-03830        Chris Craft, Judge**

_____

**No. W2018-02095-CCA-R3-CD**
_____

The Defendant-Appellant, Deangelo Love, was convicted by a Shelby County jury of first degree felony murder and criminal attempt aggravated robbery, for which he received an effective sentence of life imprisonment. In this appeal as of right, the Defendant raises the following issues for our review: (1) whether the trial court erred in denying the Defendant's challenge under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986); (2) whether the trial court erred in allowing the State to bolster a witness's testimony with a prior consistent statement; (3) whether the trial court erred in denying the Defendant's request for an alibi instruction; and (4) whether the Defendant is entitled to relief under the cumulative error doctrine. After a thorough review of the relevant facts and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Melody M. Dougherty (on appeal), and Lauren M. Fuchs (at trial), Memphis, Tennessee, for the Defendant-Appellant, Deangelo Love.

Herbert H. Slatery III, Attorney General and Reporter; Katherine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark and Leslie Byrd, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

Just before 10 a.m. on November 30, 2012, the Defendant and co-defendant, Stevie Brown, approached the home of twin brothers Derrell and Levell Bell[1] with their

_____

[1] For clarity, we will refer to Derrell and Levell Bell by their first names. We intend no disrespect.

guns drawn. Derrell and Levell were outside in their carport smoking cigarettes when the men ran up. Following a confrontation in which the Defendant and the co-defendant demanded the victims to empty their pockets, the Defendant struck Derrell on the head with the butt of his gun. The Defendant then dragged Derrell around the side of the house while the co-defendant kept Levell at gunpoint. After a short struggle, Derrell was shot in the neck and killed. The Defendant disputed his participation in the robbery and murder, but the co-defendant confessed to his and the Defendant's commission of the crimes. The following proof was adduced at the Defendant's trial, which took place on March 19-23, 2018.

**Trial**: Levell Bell testified that, on November 30, 2012, he and his twin brother, Derrell Bell, were robbed at gunpoint, and Derrell was killed. At the time of the robbery, the brothers had been smoking cigarettes in the carport outside their home on Jeannine Street in Memphis, Tennessee. Two African-American men wearing dark, hooded sweatshirts approached them with their guns drawn and asked the brothers what they had in their pockets. One of the perpetrators, later identified as the Defendant, struck Derrell with a gun, forced him to the ground, and demanded money. Derrell shielded himself, looked back at his brother, and told the gunman to "hold on, hold on[.]" The Defendant then "grabbed [Derrell] by his jacket and forced him around. . . the house" at gunpoint. The other man, later determined to be co-defendant Stevie Brown, forced Levell to the ground at gunpoint and again demanded to know what Levell had in his pockets. In response, Levell told him cigarettes and tossed them on the ground. While on the ground, Levell heard "struggling around the . . . side of the house" and then a gunshot. At this point, the co-defendant ran around the side of the house, and Levell ran across the street to call 911. Upon police arrival, Levell checked his brother's pulse and realized he had passed away.

Levell described one of the guns as black and one as silver. While uncertain, he further opined that one of the guns was a .40-caliber handgun, and the other was a nine-millimeter handgun. He believed both guns were "automatics." Levell provided a statement to police concerning the offense, as well as viewed three arrays of photographs. In the first photographic array, Levell identified co-defendant Brown as the perpetrator who held a gun on him. In the second photographic array, Levell was unable to identify anyone. Two days after the offense, upon viewing the third photographic array, Levell identified the Defendant as the perpetrator who had held the gun on his brother. Each photographic array, along with preliminary documents, was admitted into evidence. Levell also identified the Defendant as the perpetrator of the offense at the preliminary hearing and at trial.

Levell's testimony was supported by several exhibits, including a map, upon which Levell identified the location of his house, the position of the men when they first

approached, the location of the carport, and its proximity to where Derrell was taken before he was shot. Several photographs of the house also illustrated where the offenses occurred and aided Levell in explaining the sequence of events. Levell specifically testified that Derrell was taken between the carport and the house before he was killed. A truck was parked in the driveway at the time of the offense, and the area on the side of the house where Derrell was taken was twenty to thirty feet from the backyard. Levell reiterated that the offenses occurred within a matter of minutes. Finally, the State introduced a video depicting the perpetrators of the offenses, and Levell confirmed that the video accurately depicted the men on the day of the offenses.

On cross-examination, the defense introduced a prior statement given by Levell to the police on November 30, 2012. Levell agreed that he did not tell the police that co-defendant Brown was still with him when he heard the gunshot. He also did not tell the police that the men demanded money from him or Derrell, and he did not testify as to this fact at the Defendant's preliminary hearing. Levell stated that he "wanted the guys who killed [his] brother to be brought to justice." He agreed that the offense occurred over five years ago and that his memory of the offenses was probably better on the day they happened. In his statement, Levell described the man holding him at gunpoint as between five feet seven and five feet eight inches tall, thin, with dark skin and low hair, dark clothes and a dark hoodie that he wore down. Levell said this man, whom he identified as co-defendant Brown, carried a nine-millimeter, semi-automatic weapon. In contrast, Levell described the man with Derrell as stocky, six feet tall, wearing dark clothes and a black hoodie, lighter skin complexion than co-defendant Brown, and carried a .40 caliber-weapon.

Although Levell was standing close to his brother when his brother was hit with the gun, Levell did not see any bullets fall to the ground. Levell further clarified that he was not forced to the ground until after his brother was struck with the gun. However, in his statement given to police, Levell said that "one of the first things that happened was that [he] was told to get on the ground[.]" Levell explained that he heard a scuffle going on because of the beer cans located on the side of the house, but he did not hear any voices. Levell did not see the suspects after he ran from the scene, and he could not see the suspects' faces on the video surveillance recording. He agreed that he could not see anything that happened once the second man took Derrell around the side of the house.

On redirect examination, Levell explained that he had never seen the Defendant or co-defendant Brown prior to that day. He believed the perpetrators wanted money when they asked what he and his brother had in their pockets, and he felt afraid at the time. The State then played Levell's testimony from the Defendant's preliminary hearing, and the trial court instructed the jury that prior statements of witnesses could only be used to decide the credibility of a witness. Levell testified that he did his best to tell the truth at

the Defendant's preliminary hearing and that he testified as to what he remembered. The following portion of the Defendant's preliminary hearing was played in open court:

> **LEVELL**: . . . well he got my brother around the corner and I couldn't see him. So the guy told me just stop right there and lay on the ground. So I lay back -- I laid down on the ground and I heard a gunshot.
>
> **STATE**: How long from the time that your brother was drug [sic] around the corner where you couldn't see till you heard the gunshot?
>
> **LEVELL**: Maybe thirty seconds to a minute.
>
> **STATE**: Okay. And what happened at the point you heard the gunshot?
>
> **LEVELL**: The guy that had the gun on me left, he left and went around the house.
>
> **STATE**: And which direction did he go when he went around the house, the same way as your brother had been taken or the other direction?
>
> **LEVELL**: The same way my brother had been taken.

Levell did not recall telling the officers on the scene that both perpetrators carried nine-millimeter handguns.

On recross-examination, the Defendant entered a homicide witness statement given by Levell on November 30, 2012. The trial court instructed the jury that a witness may be impeached through a prior inconsistent statement. The Defendant's statement read:

> The guy on me told me to get on the ground, the other guy hit my brother with the gun, he hit the ground and I saw him shielding his face as he was on the ground. The other guy asked me what did I have and I told him cigarettes and he told me to take them out of my pocket. They other guy made my brother get up and he took him around the side of the house. The guy that had a gun on me then went to the side of the house too with my brother. About 5 seconds after he left, I heard a shot, and after about 5 more seconds and he did not return, I took the opportunity to get up and run to call the police.[Ex. 16]

- 4 -

Lieutenant Shawn Hicks of the Airways Investigation Services of the Memphis Police Department (MPD) responded to the scene following the incident. He arrived at the crime scene, secured the scene, and canvassed the neighborhood for witnesses. He spoke to Levell and a neighbor, but he did not locate any other witnesses. Asked by the State whether Levell was able to tell him where he was lying when he heard the gunshot, the defense objected based on hearsay, which was overruled by the trial court. Lieutenant Hicks testified that Levell told him that he was "in the driveway out of the house" when he heard the gunshot. Levell told him that "one of the suspects had a gun on him when he was in the driveway. . . of the house and then he heard a gunshot[.]" Levell further told Lieutenant Hicks that co-defendant Brown told Levell to "stay right there and that's when [Levell] said [co-defendant Brown] took off towards the backyard." Finally, Levell told Lieutenant Hicks that he then ran across the street to the neighbor's house.

Levell described the appearance of the perpetrators to Lieutenant Hicks and said that they were both carrying nine-millimeter handguns. Lieutenant Hicks created a report detailing his interview of Levell, which also included a layout of the crime scene. Lieutenant Hicks said that there were three cars "in and around the driveway" when he arrived at the crime scene. He found Derrell's body towards the backyard of the house in the opening between the carport and the house. He identified several additional photographs depicting the crime scene and Derrell's body. Lieutenant Hicks also located a house with a surveillance camera near the offense location. Lieutenant Chester Striplin of the MPD Video Unit responded to the house and retrieved the video surveillance in the presence of Lieutenant Hicks. Lieutenant Striplin narrated the video at trial, which was then admitted into evidence. Lieutenant Hicks watched the video, which showed "two people walking in the direction of. . . where the homicide had occurred and they were similar to the description that [Levell] had given [MPD] of the shooters."[2] The State and the Defendant played pertinent portions of the video for the jury.

On cross-examination, Lieutenant Hicks could not recall the exact address of the crime scene that he reported to, but he believed it was at the corner of Jeannine Street and Harris Avenue. After consulting his police report, Lieutenant Hicks testified that he did not include anything about the perpetrators going through the victims' pockets during the robbery because Levell told him they did not. Lieutenant Hicks spoke to the people living at the house on Harris Avenue where Levell ran after the shooting, but he did not recall going up to their house. He also identified a photograph showing Derrell laying face down in the backyard and a grey hoodie laying several feet away from him.

On redirect examination, Lieutenant Hicks testified that he received a request to report to the offense location at 9:58 a.m., and he arrived at 10:14 a.m. Lieutenant Hicks

---

[2] The record on appeal does not contain the video that was entered into evidence.

did not personally locate any evidence that could be tested for fingerprints because he was told by another officer that there was nothing to test. He was told by Levell that the suspects "kept asking him what he had on him. . . and he replied that he only had cigarettes." On recross-examination, Lieutenant Hicks testified that he noted the items of evidence found at the crime scene which included a "magazine follower," several nine-millimeter cartridges, a magazine floor plate, a bullet strike in the siding of the house, and several beer cans.

Co-defendant Stevie Brown, a Mississippi resident, testified that on the morning of the offenses he woke up, "got [himself] together," and drove to Memphis with his mother. He had planned to ride around in his mother's Chrysler 300 after he took her to work. He drove to Orange Mound to pick up a man known to him at the time as "Skip," whom he later determined to be the Defendant. At the time of the offense, co-defendant Brown had known the Defendant for less than four months and was younger than the Defendant by approximately eight years. On the day of the offense, co-defendant Brown picked up the Defendant because the Defendant asked co-defendant Brown to take him somewhere in exchange for gas money.

When co-defendant Brown picked up the Defendant from the Defendant's girlfriend's house on Pendleton Avenue, the Defendant told co-defendant Brown he wanted to rob someone. The Defendant told him where to go, had two weapons, and gave co-defendant Brown a .25-caliber, automatic handgun. Co-defendant Brown did not see the type of weapon the Defendant carried. Co-defendant Brown explained that they headed towards a house on the corner, ran up the driveway, and robbed two people. Co-defendant Brown confirmed that he pointed his gun at Levell, who was standing closer to the street. Co-defendant Brown said Derrell was standing closer to the carport, and the Defendant was standing next to Derrell. At this point, co-defendant Brown saw a gun in the Defendant's hand, which he described as a black, nine-millimeter handgun.

Co-defendant Brown observed the Defendant hit Derrell in the head with his gun three times. During this time, co-defendant Brown held Levell at gunpoint while Levell was lying on the ground. Co-defendant Brown testified that the Defendant and Derrell were "tussling" and then went "towards the backyard." Co-defendant Brown clarified that he could not see the Defendant or Derrell when they were in the backyard, but he saw them go toward the side of the victims' house. Co-defendant Brown indicated the location of the parties using photographs of the scene. Once the Defendant and Derrell disappeared from co-defendant Brown's view, he heard a gunshot around thirty seconds later. After he heard the gunshot, co-defendant Brown "took off running" back to his car, and he discarded his weapon. He and the Defendant left the crime scene in co-defendant Brown's car, and they drove to co-defendant Brown's cousin's house. Co-defendant Brown never saw the weapons he and the Defendant used after that day. Co-defendant

- 6 -

Brown was picked up by the police a few days later at Vatterott College, where he attended, and he was taken to the police station and interviewed.

Co-defendant Brown provided a description of Skip to the police. He described Skip as "about six feet" tall with light skin complexion, a low haircut, and tattoos on his hands and neck. Co-defendant Brown also told police that Skip's girlfriend lived at Pendleton Place and that Skip drove a white Corsica. Finally, co-defendant Brown identified Skip as the Defendant at trial.

On cross-examination, co-defendant Brown agreed that he had been charged in the same case with first degree murder and attempted aggravated robbery. Co-defendant Brown agreed that he was testifying against the Defendant to try to get a deal in his case. Co-defendant Brown said he was nervous after he left the crime scene, and he had three to four days to think about what was going to happen to him before the police picked him up. The defense questioned co-defendant Brown about inconsistencies in his statements concerning when he next saw the Defendant after the shooting, but Brown testified at trial that the Defendant ran from the scene with him and was in the car with him. Co-defendant Brown said he waited around four hours in the interview room before he gave his statement to the police. Co-defendant Brown said the police informed him of the charges he was facing, but they did not tell him that he could get a deal if he gave a statement.

Co-defendant Brown informed the police that he had called the Defendant on his phone and provided the phone to them. He said the drive from Pendleton Place, the Defendant's girlfriend's house, to the victims' house was around thirty minutes. When he picked up the Defendant, he did not have any plans to commit a robbery. In his statement to the police, co-defendant Brown did not tell them that he and the Defendant talked about robbing anyone on their way to the victims' house. Instead, he told the police that he "didn't want any part of a robbery."

Co-defendant Brown testified that, while he had Levell at gunpoint, he asked him if he had any money, but he did not go through his pockets or tell him to take anything out of his pockets. He also stated that, while he was giving his statement, the police told him that the Defendant's gun broke after he hit Derrell in the head with the gun, so he included this in his statement. He was not aware that there was video surveillance in the neighborhood when he gave his statement. He explained that the police told him about a camera angle, so he included this in his statement. Co-defendant Brown explained that he and the Defendant ran away "almost side-by-side," but he did not know that Levell was running behind him. He and the Defendant had not planned to go to the victims' house specifically, he did not know the victims, and they did not know him. Co-defendant Brown said he was being honest with the police and the jury. Finally, co-

defendant Brown said he had been in custody for five years leading up to the Defendant's trial.

Sergeant Michael Coburn of the MPD Crime Scene Unit responded to the crime scene and observed Derrell lying on the north side of the house. He identified photographs of the house that were previously entered into evidence and conducted a walk-through of the crime scene for the jury. He prepared two sketches of the crime scene, which were entered into evidence. Sergeant Coburn then identified a series of photographs that he took at the crime scene. The first set of photographs depicted the following items of evidence: "part of a magazine where the spring attaches to the butt plate," the butt plate to the magazine, and two live rounds of ammunition. These items were all found in close proximity to each other. Sergeant Coburn described the magazine butt plate as the part that attached to the bottom of the magazine to keep the ammunition inside. He said if this piece were removed, the ammunition would fall out. He further explained that live rounds of ammunition were rounds that were not yet fired. Sergeant Coburn stated that a magazine was not found at the crime scene and that a gun would still fire if the magazine remained in the gun. Sergeant Coburn stated that a gun would fire if the magazine remained in the gun, even if the butt plate were removed. Sergeant Coburn testified as to how semi-automatic weapons fired differently than automatic weapons.

Sergeant Coburn identified another photograph which depicted another live round of ammunition. This round was located under a tire of a car parked in the victims' driveway. The next set of photographs showed three additional live rounds of ammunition found in the victims' driveway. The next set of photographs depicted the back door of the victims' house, a spent shell casing, and "a circular defect in the wall [of the house] with [an] orange trajectory rod going through it." He later identified the casing to be a nine-millimeter. Sergeant Coburn described the trajectory rod as going from "west to east, left to right, with a slightly downward angle." He said the purpose of the trajectory rod was to "show[] a possible trajectory that the bullet travelled." The next set of photographs showed the trajectory rod extending into the inside of the house. He described these photographs as follows: "That's a trajectory rod coming from the outside in striking this two-by-four and that's going to be a bullet strike, not an actual hole. There was [insulation] here and a possible bullet that. . . might have been in that [insulation] on the scene at the time." Sergeant Coburn also identified a photograph of the insulation that was pulled from the wall where the trajectory rod went through. Sergeant Coburn processed the insulation and found the spent projectile inside.

The next set of photographs depicted a "possible blood trail" leading from the door on the side of the victims' house to the backyard. The photographs showed blood on bags and beer cans in the yard, blood on a green trashcan, and blood on the ground. Sergeant Coburn used arrows to indicate the direction that Derrell could have travelled

after he was shot. The last set of photographs showed Derrell lying on his stomach on the ground, his grey hoodie lying a few feet away, and a pack of cigarettes, a cell phone, and a lighter that were inside Derrell's hoodie. After Derrell's body was removed from the crime scene, Sergeant Coburn collected the aforementioned evidence. These items were all entered into evidence. Sergeant Coburn processed the live rounds of ammunition, the spent shell casing, and the magazine pieces to look for fingerprints, but he did not find any.

On cross-examination, Sergeant Coburn testified that he had dealt with "an array of weapons" both professionally and personally. He stated that if the butt plate of a gun and the bullets in the magazine fell out and there was no bullet in the chamber, then the gun would not fire. He said there was no way to tell from the butt plate or the spring attachment whether there was a bullet in the chamber of the gun they were attached to. He had "no idea" if there was a bullet in the chamber of that gun, and he did not know whether the six live rounds of ammunition came out of the same gun or if they came from the same gun as the butt plate and the spring. He said the six live rounds and the spent shell casing came from the same type of gun, but he could not determine if they came from the same gun. Sergeant Coburn did not test the spent projectile or the insulation for the presence of blood, and he did not collect DNA samples on any of the items. He also did not swab or test the blood found at the crime scene.

Using the trajectory rod as a point of reference, Sergeant Coburn testified that the gun would have to have been fired from "somewhere . . . to the left of" where the hole in the house was located. He said the trajectory rod could not be completely accurate, but he stated that the one used in this case was "fairly accurate." Sergeant Coburn identified another set of photographs that he took at the crime scene, and these were entered into evidence. One of those photographs was of Derrell's Tennessee driver's license which was located in the wallet found on his body.

On redirect examination, Sergeant Coburn testified that, when a bullet enters a body, the trajectory and the velocity of the bullet could change. He affirmed multiple times that the trajectory rod was not completely accurate.

The jury was taken to the crime scene and was permitted to walk along the streets adjacent to the victims' home. The trial court instructed the audience not to attend the crime scene while the jury was there, and the Defendant chose not to go to the crime scene alongside the jury.

Officer Mundy Quinn of the MPD Homicide Bureau was the case coordinator for the instant offenses. Initially, Officer Quinn did not have any suspects, but he received a Crime Stoppers tip the next day which allowed him to create a photographic array of co-

defendant Stevie Brown and Anthony Bowles. He prepared a photographic array of Bowles because the tip gave him the name Skip, which was Bowles's nickname. The tip also said that Skip lived in Orange Mound. Officer Quinn showed the photographic arrays to Levell, and provided him with an advice of rights form. During the photographic array including co-defendant Brown's photograph, Levell circled co-defendant Brown's photograph almost immediately. However, Levell not did make an identification from the lineup containing Bowles's photograph. Following an interview by Officer Quinn with co-defendant Brown, he initially denied any involvement in the crime. However, when Officer Quinn told co-defendant Brown that he had been identified in a photographic lineup, co-defendant Brown confessed and gave a statement. Officer Quinn asked co-defendant Brown to explain the presence of the magazine butt plate and live ammunition found at the crime scene. He also asked co-defendant Brown about the presence of the video surveillance camera. Officer Quinn testified that co-defendant Brown told him that he parked his car away from the angle of the camera.

Officer Quinn testified that co-defendant Brown provided him with Skip's cell phone number and told him that Skip's girlfriend lived at Pendleton Place and drove a white Chevrolet Corsica. Co-defendant Brown also gave Officer Quinn a description of Skip. Officer Quinn provided this information to investigators, who discovered that the phone number belonged to Jessica Garrett and that she drove a white, Chevrolet Corsica. He discovered two citations issued to that car, one to Garrett and one to the Defendant. Rena Morris, a senior deputy court clerk for the City Court of Memphis, testified that she maintained police tickets written by MPD. She pulled a ticket that was issued to the Defendant in 2012, which was entered into evidence. Officer Quinn showed co-defendant Brown a photograph of the Defendant, and co-defendant Brown identified the Defendant. Officer Quinn also created a third photographic array with the Defendant's photograph, and he asked Levell to come back to the police station. Levell identified the Defendant from the photographic array. Officer Quinn stated that Levell made this identification within two minutes. Thereafter, Officer Quinn spoke to the Defendant, who denied any involvement in a homicide and denied knowing co-defendant Brown. After Officer Quinn "confronted [the Defendant] with the fact that he was identified by the surviving victim in a photographic lineup," the Defendant advised Officer Quinn that he did not wish to speak to him anymore. He said the Defendant signed his Miranda warnings with his left hand.

On cross-examination, Officer Quinn testified that the Crime Stoppers tip stated that Skip and co-defendant Brown were cousins. The defense showed Officer Quinn a map showing a path from Joanne Avenue to the Pendleton Place apartments, and he opined that the distance between these locations was only a few minutes. Officer Quinn said he did not tell co-defendant Brown what to write in his statement. He confirmed that the Defendant asked him why he was under arrest.

- 10 -

Jessica Garrett testified that she was dating the Defendant on the date of the offense, and she identified him at trial. She said the Defendant went by the nickname Skip. Garrett confirmed that she lived at Pendleton Place apartments and that she drove a white Corsica. She also gave her phone number, and said the Defendant wore glasses when they were dating. On cross-examination, Garrett testified that the Defendant took her to work in her car on the morning of the offense and that the Defendant kept her car the rest of the day. She said the Defendant dropped her son off at school after he took her to work. He also picked up Garrett after work. Garrett located Pendleton Place Apartments on a map previously entered into evidence. She said her apartment was "not far" from Sims Street. On redirect examination, Garrett stated that she was not very familiar with the area, but she guessed that the Defendant was familiar with the area. On recross-examination, Garrett identified a photograph of the Defendant wearing glasses, which was entered into evidence.

Dr. Miguel Laboy, a medical examiner and expert in anatomical and forensic pathology, performed the autopsy on Derrell, and his report was entered into evidence. Dr. Laboy described Derrell's injuries as follows: "a gunshot wound to the neck and also an abrasion on the lateral right chest and an exit wound on the right back from that gunshot wound to the neck." Dr. Laboy took several photographs of Derrell's injuries. He said that Derrell's gunshot wound was surrounded by soot and stippling, which meant Derrell was shot at close range. Dr. Laboy stated that the cause of death was a gunshot wound to the neck, and the manner of death was homicide. On cross-examination, Dr. Laboy described the trajectory of the bullet as "going downward, left to right and . . . slightly front to back." On redirect examination, Dr. Laboy testified that the position of the body and the angle of the weapon used could affect the trajectory of a bullet.

At the close of the State's proof, the State made a motion to have the Defendant display his tattoos for the jury. The Defendant argued that this was a violation of his Fifth Amendment right against self-incrimination and that the Defendant could have gotten more tattoos in the five years since the incident, but the trial court granted the State's motion. The Defendant displayed his hands and neck to the jury. After the State finished its proof, the Defendant made a motion for a judgment of acquittal, which the trial court denied. The Defendant did not present any proof.

Following deliberations, the jury convicted the Defendant of first degree felony murder and criminal attempt aggravated robbery. The trial court automatically sentenced the Defendant to life in prison. The trial court conducted a sentencing hearing on August 10, 2018. The Defendant's presentence report was entered into evidence. Elivery Love, the Defendant's mother, testified that the Defendant dropped out of high school to help support his family, including his son. She said the Defendant earned his GED while

incarcerated and participated in classes. She also said the Defendant worked side jobs to support his son and his step-son. The trial court sentenced the Defendant to a concurrent term of ten years as a Range III, persistent offender for the criminal attempt aggravated robbery, for an effective sentence of life imprisonment.

On October 19, 2018, the trial court conducted a hearing on the Defendant's amended motion for judgment of acquittal and his motion for new trial, which were denied. The Defendant filed a timely notice of appeal, and his case is now properly before this Court for our review.

## **ANALYSIS**

**I. Batson Challenge.** The Defendant, who is an African-American male, contends that the trial court erred in overruling his Batson challenge during jury selection. See Batson, 476 U.S. 79. He asserts that the State issued peremptory challenges for three prospective African-American jurors: Juror 1, Juror 2, and Juror 3.[3] He argues that the State's "proffered race-neutral reason for striking [Juror] 3 was merely pretextual" and that the State offered no reason for striking Jurors 1 and 2. The Defendant suggests that his argument is supported by the Shelby County District Attorney General Office's history of excluding African-American jurors. The State responds that it offered a race-neutral reason for striking Juror 3, and, as such, the trial court did not err in overruling the Defendant's Batson challenge. The State also asserts that the Defendant "has not pointed to any evidence establishing that Shelby County prosecutors have a history of systematically excluding African-Americans from the jury." We agree with the State.

The Equal Protection Clause of the United States Constitution prevents the State from exercising peremptory challenges to excuse potential jurors on account of their race. Batson, 476 U.S. at 89; State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006). In Batson, 476 U.S. at 89, the United States Supreme Court held that the State's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates that defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. A few years later, in Powers v. Ohio, 499 U.S. 400, 416 (1991), the Court held that a criminal defendant may object to race-based exclusions of jurors through peremptory challenges regardless of whether the defendant and the excluded jurors share the same race.

When a defendant alleges that the State is excluding a juror based on the juror's race, Batson provides a three-step process for determining when a peremptory challenge

---

[3] For privacy reasons, we have removed the names of the jurors in this case, and we will refer to them by numbers instead.

is discriminatory. 476 U.S. at 96-98; see State v. Kiser, 284 S.W.3d 227, 255 (Tenn. 2009); Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016). The first prong requires the defendant to make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Batson, 476 U.S. at 93-94; Kiser, 284 S.W.3d at 255. A defendant "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94.

If the trial court determines that the defendant has made out a prima facie showing that the peremptory challenge has been exercised on the basis of race, then the second step requires the State to provide a race-neutral explanation for its challenge. Id. at 97; State v. Echols, 382 S.W.3d 266, 281 (Tenn. 2012) (citing Kiser, 284 S.W.3d at 255-56). The State's race-neutral explanation "must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge . . . [but] need not be persuasive, or even plausible." Hugueley, 185 S.W.3d at 368 (citing Purkett v. Elem, 514 U.S. 765, 767-68 (1995)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race[-]neutral.'" Id. (quoting Purkett, 514 U.S. at 768).

If the State offers a race-neutral explanation, then the third prong requires the trial court to determine if the defendant has established purposeful discrimination. Batson, 476 U.S. at 98; see Hugueley, 185 S.W.3d at 368 ("If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination."). When considering this third step, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 365 (1991). "[D]etermination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); see Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) ("Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."). "'The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual.'" Kiser, 284 S.W.3d at 255 (quoting Hugueley, 185 S.W.3d at 368). At this third step, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768. If the court finds that the proffered reason is merely pretextual and that the challenge is a racially motivated, then the juror may not be excluded. Kiser, 284 S.W.3d at 255 (citing Hugueley, 185 S.W.3d at 369).

"[T]he ultimate burden of establishing purposeful discrimination lies with the party objecting to the peremptory challenge." Hugueley, 185 S.W.3d at 374 (citing Batson, 476 U.S. at 93); see also Purkett, 514 U.S. at 768 (recognizing that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). The Tennessee Supreme Court has emphasized the importance of a trial court's findings regarding a Batson violation:

> The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination. The trial court's factual findings are imperative in this context.

Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn. 1996); see Batson, 476 U.S. at 97.

"On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." Woodson, 916 S.W.2d at 906; see Foster, 136 S. Ct. at 1747 (noting that the third step in Batson "turns on factual determinations," and that "'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." (citation omitted)). "Deference [to the trial court's findings on the issue of discriminatory intent] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." Miller-El, 537 U.S. at 339.

As relevant to this issue, during voir dire, the prosecutor asked prospective jurors if they had been the victim of a crime. The following exchange occurred with Juror 3:

**[JUROR 3]**: And I have a brother also that was in prison.

**[PROSECUTOR]**: Okay.

**[JUROR 3]**: And his trial was here.

**[PROSECUTOR]**: In Shelby County.

**[JUROR 3]**: In Shelby County.

**[PROSECUTOR]**: About how long ago was that?

**[JUROR 3]**: Oh, about 2005.

- 14 -

. . .

**[PROSECUTOR]**: And, again, [Juror 3], having been through that experience is there anything about that, having gone through that experience that would make you hold that against the State this week or against law enforcement?

**[JUROR 3]**: No.

**[PROSECUTOR]**: You think that's something that you can set aside?

**[JUROR 3]**: Yes.

**[PROSECUTOR]**: What were the charges in that case or what was the conviction in that case?

**[JUROR 3]**: I don't really understand because I didn't go to his hearings of the case and stuff. It was some of his friends had got, I think they had robbed somebody or something and I think he was the (inaudible) in the lookout person or something.

**[PROSECUTOR]**: Okay. We're going to talk about some of that in a minute. I want you to think about, again, whether having been through that circumstance with your family whether that's something that would affect you in this case if the circumstances were similar, do you think that's something that might affect your ability to be fair and impartial.

**[JUROR 3]**: No, it won't affect my ability. But they were saying they didn't have any evidence against him, so.

**[PROSECUTOR]**: Okay. But there was a conviction in that case?

**[JUROR 3]**: Yes, and be about an hour to convict.

**[PROSECUTOR]**: And again, is there something about that that makes you think you might go one certain way bias against the State or against law enforcement?

**[JUROR 3]**: No.

**[PROSECUTOR]**: That you might hear from in this case.

**[JUROR 3]**: No.

In addition to Juror 3 indicating that her brother had been convicted of a crime, one juror indicated that her nephew had been convicted of a rape in Shelby County in 2015 or 2016. This juror's name was not included in the trial transcript. Juror 4 indicated that her grandson was convicted in federal court in 2015. She did not indicate why her grandson was arrested or convicted. Juror 4 was ultimately chosen as a juror on the Defendant's case. The races of these jurors were not indicated in the trial transcript.

After Juror 3 was excused, the Defendant objected on the basis of Batson. The following exchange occurred between defense counsel, the State, and the trial court:

**DEFENSE COUNSEL**: Your Honor, we'd like to make a Batson challenge.

**STATE**: We've only challenged three people and [Juror 3] said that her –

**TRIAL COURT**: Well just a second I want to finish her objection.

**DEFENSE COUNSEL**: (Inaudible) like the State has been against an African American, your Honor.

**TRIAL COURT**: I think there were two and then several passes.

**DEFENSE COUNSEL**: Yes, it was [Juror 1] and then –

**TRIAL COURT**: And this new juror.

**DEFENSE COUNSEL**: Yes.

**TRIAL COURT**: And would you give me a racially neutral reason for this strike.

**STATE**: We struck her because she said her son was arrested and convicted in Shelby County on aggravated robbery. This is an aggravated robbery case and then she went further to say that from her understanding there was no evidence against him and that –

- 16 -

**TRIAL COURT**: Yeah, you know, I was going to say there were several people involved and he was just outside. So I think that's a valid reason, Ms. Fuchs.

**DEFENSE COUNSEL**: She also said that she could be fair and set that aside.

**TRIAL COURT**: I understand that but that's her racially neutral reason for the excuse, so I'll allow it.

**STATE**: Thank you, judge.

**TRIAL COURT**: All right. And there were also several other African American in the panel and they did not strike anyone after the first round. So I find there's no Batson issue.

At the Defendant's motion for new trial hearing, he argued that the trial court erred in denying his [Batson] challenge. Defense counsel stated,

What had happened, Your Honor, is there had been four -- three persons who were struck. [Juror 1], [Juror 2], [Juror 3] and a fourth person was also struck, [Juror 5]. The first three persons, [Jurors 1, 2, and 3] were black persons.

As to [Juror 5], although he was Caucasian, he was a former client of Defense Counsel's. It is our claim, Your Honor, that the State did not provide a race neutral reason, although they did make a claim that it was race neutral, it was not sufficiently supported. And it was not sufficiently related to the case to be tried.

It is our contention -- position that this was a [Batson] error and their challenge to this person should not have been upheld, Your Honor.

The trial court held as follows on this issue:

As far as denying the [Batson] challenges I --of course I keep notes on the race of each person and their gender. And I saw the things that the State gave me if there were a pattern were good reasons. They weren't based on race. They were racial neutral reasons. And I find that my rulings were proper in Number 5 as far as [Batson] challenge.

- 17 -

The Defendant contends that the State's proffered race-neutral reason for striking Juror 3 was merely pretextual. He bases this assertion on the fact that two other potential jurors had family members convicted of crimes in Shelby County and on the supposed practice of Shelby County prosecutors excluding African-Americans from juries and fighting to keep Caucasians on juries. The State responds that the prosecutor's reason for striking Juror 3 was not pretextual because she indicated during voir dire that "her relative had been convicted of an offense at issue in the defendant's case and because she seemed to believe that he had been *wrongly* convicted." The State asserts that these additional facts distinguished Juror 3 from the two other jurors.

Upon our review, we conclude that the findings of the trial court do not constitute error. Although we do not know the race of any of the jurors other than those addressed in the Defendant's Batson challenge, the trial court stated that there were African-American jurors whom the State did not strike. The record shows that Juror 3's brother was involved in a robbery and sent to prison. Although Juror 3 said she could be unbiased, she indicated that there was no evidence against her brother. Juror 3's experience with her brother's case more closely resembled the Defendant's case than those of the other jurors who indicated that their family members had been convicted in Shelby County. Therefore, we conclude that the trial court's findings in overruling the Defendant's Batson challenge were not erroneous, and the Defendant is not entitled to relief as it relates to Juror 3. As for Jurors 1 and 2, the Defendant failed to provide any analysis as to why their exclusion from the jury constituted a Batson violation, so this issue is waived as to them.

Finally, the Defendant's claim that the Shelby County District Attorney General's Office has a history of excluding African-American jurors is not supported by the record. We have reviewed each of the cases cited by the Defendant to support this assertion, and no Batson violations were found in any of these cases. Additionally, this Court has previously concluded that there is not a history of the State excluding African-Americans from juries in Shelby County. State v. Cathey, No. W2008-01446-CCA-R3-CD, 2010 WL 2836632, at *13 (Tenn. Crim. App. July 20, 2010) (citing Hugueley, 185 S.W.3d at 375.).

**II. Bolstering a Witness's Testimony.** The Defendant argues that the trial court erred by allowing Lieutenant Hicks to testify regarding several statements made to him by Levell Bell, including "where [Levell] said he was when he heard the gunshot, [] Brown's location at the time of the gunshot, [] Brown's actions after the shot, [Levell's] actions afterward, and [Levell's] description of the guns." The Defendant objected at trial, arguing that these statements were hearsay. The State responded at trial that Levell's statements qualified as prior consistent statements and could come into evidence under this exception to the hearsay rule. The trial court allowed these statements into

evidence, finding that they could be used to bolster Levell's credibility. The Defendant argues that prior consistent statements are not admissible to bolster a witness's credibility absent a showing that Levell's testimony was a "recent fabrication or a deliberate falsehood." As such, the Defendant asserts that the trial court abused its discretion in allowing this testimony into evidence. He submits that this error affected the outcome of his trial because of the importance of Levell's credibility "as the only witness corroborating [] Brown's testimony."

In response, the State contends "the trial court properly admitted Lieutenant Hicks's testimony to rehabilitate Levell's credibility after his testimony had been attacked during cross-examination and through the admission of his police statement." The State argues that any error in admitting this evidence was harmless as "[t]he jury's consideration of [] Brown's testimony did not depend on bolstering Levell's credibility with the complained-of testimony since [] Brown's testimony was sufficiently corroborated by other details in Levell's testimony, the surveillance video showing the [D]efendant and [] Brown approaching the brothers' house, and police corroboration of [] Brown's description and location of the [D]efendant."

The Tennessee Supreme Court has generally held, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn.2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn.2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn.1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn.1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn.1992)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn.2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn.2006)). This court has also concluded that the issue of hearsay and whether it is admissible as an exception to the hearsay rule is reviewed de novo, as a matter of law. State v. Gilley, 297 S.W.3d 739, 760 (Tenn.Crim.App.2008).

In determining whether a statement is hearsay and, if so, whether it fits within one of the hearsay exceptions, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759–61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule— are questions of law subject to de novo review." Id. (citing State v. Schiefelbein, 230

- 19 -

S.W.3d 88, 128 (Tenn. Crim. App. 2007); <u>Keisling v. Keisling</u>, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

"Prior consistent statements are generally not admissible to bolster the testimony of a witness." <u>State v. Herron</u>, 461 S.W.3d 890, 904-05 (Tenn. 2015) (citing <u>Farmer v. State</u>, 296 S.W.2d 879, 882 (Tenn. 1956); <u>State v. Hodge</u>, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); <u>State v. Meeks</u>, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); <u>State v. Braggs</u>, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, a prior consistent statement may be admissible as an exception to the rule against hearsay "to rehabilitate a witness whose testimony is attacked on cross-examination as 'recent fabrication' or 'deliberate falsehood.'" <u>Id.</u> at 905 (quoting <u>State v. Benton</u>, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988)). In such cases, a prior consistent statement can be used "as a means of rebuffing such attacks and showing that the witness's trial testimony is consistent with statements made before any improper influence or motive to lie existed." <u>Id.</u> (citing <u>Sutton v. State</u>, 291 S.W. 1069, 1070 (Tenn. 1927)). Before a prior consistent statement becomes admissible, "the witness'[s] testimony must have been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up." <u>Benton</u>, 759 S.W.2d at 433–34; <u>see</u> <u>State v. Kendricks</u>, 891 S.W.2d 597, 603 (Tenn. 1994) (holding that a prior consistent statement is admissible as rehabilitative evidence only after a witness's credibility has been attacked). However, "[t]he impeaching attack on the witness's credibility need not be successful for admissibility of the prior consistent statement." <u>State v. Albert R. Neese</u>, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. Dec. 15, 2006). A prior consistent statement used to rehabilitate a witness is not hearsay because it is not offered for the truth of the matter asserted. <u>Herron</u>, 461 S.W.3d at 905; <u>see</u> Tenn. R. Evid. 801(c).

Prior consistent statements admitted pursuant to this exception are not to be used as substantive evidence of the truth of the matter asserted and are to be used only to rehabilitate the witness's credibility. <u>Herron</u>, 461 S.W.3d at 905 (citing <u>State v. Livingston</u>, 907 S.W.2d 392, 398 (Tenn. 1995); <u>State v. Braggs</u>, 604 S.W.2d 883, 885 (Tenn. 1980); Cohen § 8.05[5], at 8-49 to -50). Furthermore, upon request, a trial court should instruct the jury as to the limited purpose for which a prior consistent statement has been admitted. <u>Id.</u> (citing Tenn. R. Evid. 105; <u>Livingston</u>, 907 S.W.2d at 398; <u>Braggs</u>, 604 S.W.2d at 885)).

As relevant to this issue, on direct examination, the State asked Lieutenant Hicks whether Levell was able to tell him where he was lying when he heard the gunshot, and the defense objected on hearsay grounds. The following exchange occurred:

> **DEFENSE COUNSEL**: I understand that [the State is] wording it very carefully thus far but this is now I think we're getting into hearsay. And I

understand that [the State has] worded it to where it might not be there but I think it, it (inaudible) with her with quite few to what he's saying.

**STATE**: No, I'm going to ask him what he said, so. Yes, we should -- I think it would be hearsay but it's going to be a prior consistent statement and so it would be an exception to the hearsay rule.

**TRIAL COURT**: Well it would not be hearsay because it's not being offered for the truth of the matter asserted. It's being offered to bolster the credibility of the witness.

**DEFENSE COUNSEL**: Which witness? Mr. Levell Bell?

**TRIAL COURT**: Mr. Bell. In other words, it's a prior consistent statement. So it's not hearsay because it's not substantive evidence. It's being offered to show that he said the same thing that he said on the stand. So I'm going to overrule your objection.

Following this exchange, Lieutenant Hicks testified that Levell told him that he was "in the driveway out of the house" when he heard the gunshot. He said Levell told him that "one of the suspects had a gun on him when he was in the driveway. . . of the house and then he heard a gunshot[.]" Levell told Lieutenant Hicks that the man with the gun on him told him to "stay right there and that's when he said he took off towards the backyard." Levell told Lieutenant Hicks that he then ran across the street to the neighbor's house.

The record shows that defense counsel repeatedly cross-examined Levell about his statement to police on the day of the offense. Defense counsel questioned Levell numerous times about whether he told police that co-defendant Brown was still holding him at gunpoint when they heard the gunshot and whether he told police that the suspects demanded money from him. He responded that he did not tell the police either of these things in his statement, although on direct examination Levell testified that the suspects demanded money from them and that co-defendant Brown was still holding him at gunpoint when he heard the gunshot. Defense counsel also questioned Levell about his motive for testifying and "whether [he] want[ed] to help the police in this process." Levell indicated where he was kneeling down in the carport after the suspects approached. Defense counsel questioned him about discrepancies in his statements regarding at what point in time he got on the ground. On redirect, the State played a portion of the Defendant's preliminary hearing in which Levell testified that co-defendant Brown was holding him at gunpoint when he heard the gunshot. The State properly qualified this as a "prior consistent statement after an attempt to impeach a witness." The

trial court also provided a curative instruction to the jury that this statement was not to be used as substantive evidence but only to decide whether the witness was telling the truth. Defense counsel entered Levell's redacted statement to police as an exhibit on recross-examination.

Based on the record, the defense repeatedly attempted to attack Levell's credibility at trial by impeaching his testimony given on direct examination with his statement given to police. The defense insinuated that Levell's entire testimony was not trustworthy, including his identification of the Defendant. Because the defense tried to impeach Levell's credibility in this way, the trial court did not abuse its discretion in allowing the State to ask Lieutenant Hicks about Levell's statement to him about where he was lying and where Brown was standing when Levell heard the gunshot. Lieutenant Hicks's brief testimony about Levell's statements was properly allowed into evidence as a prior consistent statement admitted after Levell's credibility regarding the robbery was attacked on cross-examination. The record also shows that the trial court instructed the jury on prior consistent statements of witnesses on multiple occasions. Accordingly, we conclude that the trial court did not err by allowing Lieutenant Hicks to testify about prior consistent statements given by Levell Bell.

**III. Alibi Jury Instruction.** The Defendant contends that the trial court erred in denying his request for an alibi jury instruction. He asserts that Jessica Garrett's testimony that he took her to work and took her son to school on the morning of the offense fairly raised the defense of alibi. In response, the State contends that the "trial court properly declined to provide the instruction, where the purported alibi witness did not provide any evidence of what time the defendant was in a location other than the crime scene." Because the Defendant did not provide evidence that his guilt was a physical impossibility, the State asserts he was not entitled to an alibi instruction. We agree with the State.

A defendant has a right to a correct and complete charge of the law. State v. Clark, 452 S.W.3d 268,294 (Tenn. 2014) (citing State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011); State v. Majors, 318 S.W.3d 850, 864 (Tenn. 2010)). Accordingly, trial courts have a duty to give "'a complete charge of the law applicable to the facts of a case.'" State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (citing State v. Rogers, 188 S.W.3d 593, 628-29 (Tenn. 2006); State v. Thacker, No. E2011-02401-CCA-R3-CD, 2012 WL 4078440, at *8 (Tenn. Crim. App. Sept. 18, 2012)).

Trial courts have an affirmative duty to instruct the jury on every issue raised by the proof, including the accused's theory of defense, and specifically including the defense of alibi. State v. Mathis, No. 03C01-9807-CC-00249, 1999 WL 878261, at *3-4 (Tenn. Crim. App. Oct. 14, 1999) (citing Poe v. State, 212 Tenn. 413, 370 S.W.2d 488, 491 (Tenn.1963). See also State v. McPherson, 882 S.W.2d 365, 374 (Tenn.Crim.App.1994) (citations omitted)). When a defendant pursues an alibi defense at trial, the trial court must instruct the jury on the defense when it is "fairly raised" by the evidence. Id. (citing Manning v. State, 500 S.W.2d 913, 916 (Tenn.1973); Poe v. State, 370 S.W.2d 488, 491 (Tenn. 1963). See also State v. Hardin, 691 S.W.2d 578, 581 (Tenn.Crim.App.1985)). The duty exists irrespective of a request for the instruction by the defendant. Id. (citing Poe, 370 S.W.2d at 491).

The Tennessee Supreme Court has provided three scenarios reflecting when an alibi defense has been "fairly raised", thereby making the instruction mandatory. Id. (citing Manning, 500 S.W.2d at 916). Those scenarios are:

(1) where the defendant's alibi has been corroborated by other credible witnesses;
(2) where the victim has been unable to identify the defendant; or
(3) where the proof against the defendant is wholly circumstantial.

Id. Only when the evidence fairly raises the defense by meeting one of the above circumstances does the trial court have an unequivocal duty to instruct the jury. Where the evidence does not meet these circumstances, the trial court is not required to give such an instruction. Id. (citing Almonrode v. State, 567 S.W.2d 184, 186 (Tenn.Crim.App.1978)).

As relevant to this issue, during discussions on proposed jury instructions, the State asked the trial court to remove the proposed alibi instruction, while the Defendant asked that it be given to the jury. The following exchange occurred:

> **STATE**: Judge, I don't think there was any -- there was an opportunity to elicit information as far as what time these events happened and that was not taken advantage of. I don't think the proof from the stand was sufficient to establish an alibi. They said that she said -- that he dropped him off at school. The information that was presented to the jury was that the crime happened approximately 9:49 and there was an opportunity to ask what time school was or anything like that and it wasn't. So I don't I think -
>
> **TRIAL COURT**: I think the testimony was he had the car.

- 23 -

**STATE**: He had the car.

**DEFENSE COUNSEL**: Your Honor, I think that that's a jury question.

**TRIAL COURT**: Well, it's the question whether or not it's fairly raised in the proof. They were not asked where he was or if he was there the whole time or anything about that. No one testified to where he was at the time of the crime.

**STATE**: I don't think it's been fairly raised, judge.

**DEFENSE COUNSEL**: Note my objection.

**TRIAL COURT**: Well, no, I haven't ruled on it yet. I'm still hearing.

**DEFENSE COUNSEL**: Your Honor, I –

**TRIAL COURT**: Did y'all all put on any on proof that he was somewhere else?

**DEFENSE COUNSEL**: Your Honor, Ms. –

**TRIAL COURT**: At 9:45.

**DEFENSE COUNSEL**: -- Jessica Garrett testified that that morning he took her to work and then after taking her to work took her child to school and the elementary.

**TRIAL COURT**: Right.

**DEFENSE COUNSEL**: There was not any specific time developed but I think that that is still sufficient that she did testify that it was that morning. And I think that that is sufficient to put it before the jury for them to determine whether or not he was present on the scene at 1498, which is the State's burden to prove that he was there.

**TRIAL COURT**: All right. But it's the State's burden to prove he was on the scene but the question is whether or not the defense put on any proof that he was not on the scene at that time and I didn't hear any that he was not there. I know he did other things that morning, like for instance, he

- 24 -

took her child to school after dropping her off to work but there was no, you know, school started at 9:40 maybe but that's not, you know, she didn't even say he got him there on time. So, so make sure to put it in writing so you won't waive it but I'm not going to charge alibi.

The Defendant asserts that Garrett's testimony established an alibi for him on the morning of the offense. Garrett testified that the Defendant took her to work on the morning of the offense and dropped her son off at school after he took her to work. She did not indicate what time this occurred. The evidence presented at trial established that the crime took place at around 9:45 a.m. on November 30, 2012. We conclude that Garrett's testimony did not establish an alibi for the Defendant. She never stated that the Defendant was with her or her son at the time Derrell was murdered. In addition, no other witnesses corroborated the Defendant's alibi theory. In fact, the surviving victim and the co-defendant testified that the Defendant was present at the crime scene and that he shot Derrell Bell. Co-defendant Brown testified at length about how he knew the Defendant and about the Defendant's involvement in the crimes. As such, the evidence against the Defendant was not wholly circumstantial. We conclude that alibi was not fairly raised by the evidence. Accordingly, the trial court did not err in denying the Defendant's request for a jury instruction on alibi.

**IV. Cumulative Error.** The Defendant contends that he is entitled to relief under the cumulative error doctrine. The State responds that the trial court did not err, and, as such, that the cumulative error doctrine does not apply. In the alternative, the State argues, "if this Court determines that there were harmless errors in the trial proceedings, the aggregate of those errors did not deny the [D]efendant his right to a fair trial, given the overwhelming evidence of his guilt." The cumulative error doctrine provides, in short, as follows:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). Because we have determined that the trial court did not err on any of the Defendant's aforementioned issues, we need not consider the cumulative effect of the alleged errors. Hester, 324 S.W.3d at 77 ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

- 25 -

## CONCLUSION

After thoroughly reviewing the trial court record and the applicable law, we affirm the judgments of the trial court.

_____
CAMILLE R. MᴄMULLEN, JUDGE